# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs October 1, 2013

## STATE OF TENNESSEE v. TERRY JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-06785    John T. Fowlkes, Jr., Judge**

---

**No. W2012-01510-CCA-R3-CD  -  Filed March 31, 2014**

---

A Shelby County Criminal Court Jury convicted the appellant, Terry Johnson, of one count of second degree murder, three counts of attempted second degree murder, and one count of possession of a firearm during a dangerous felony. The trial court imposed a total effective sentence of twenty-six years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions and the trial court's refusal to allow the appellant to introduce evidence of the deceased victim's involvement in an unrelated murder. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Joseph A. McClusky (on appeal) and Jake Erwin (at trial), Memphis, Tennessee, for the appellant, Terry Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Theresa McCusker and Muriel Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's convictions arose as a result of a shooting following an altercation in the parking lot of a Krystal's restaurant. The appellant was indicted for the first degree

murder of Randy Farmer; the attempted second degree murder of Deonte Tucker, Jermaine Mitchell, and Telvin Totes; and possession of a firearm during a dangerous felony. The appellant did not deny that he shot into the victims' car but maintained that he acted in self-defense.

The proof at trial revealed that on the evening of July 4, 2010, Jermaine Mitchell, Randy Farmer,[1] Telvin Toles, and Deonte Tucker went to the Level 2 Club. According to Mitchell, the men did not drink alcohol at the club, but some of them smoked marijuana. Mr. Farmer's girlfriend, Richeria Bell, was at another club with Whitney French, Keniece Burks, and Angel Balfour.

At approximately 3:00 a.m., Bell called Mr. Farmer, and they arranged to meet at a Krystal's restaurant on Mt. Moriah. As the women drove toward the restaurant, Alecia Thomason called Burks and said that she was meeting her boyfriend, the appellant, at the restaurant.

Bell and her friends were the first to arrive at the restaurant parking lot. Shortly thereafter, the appellant and Xavier Cook arrived in an SUV, and they parked in a dark corner of the parking lot. Subsequently, Mr. Farmer and his friends arrived in a Lincoln. Mr. Farmer, Mitchell, and Toles got out of the car, but Tucker remained inside, talking on his cellular telephone. Mitchell and Toles sat on the trunk while Mr. Farmer went to talk to the women.

Shortly thereafter, another car containing approximately five women and driven by Thomason, came into the parking lot. Mitchell heard the women say "that the driver was going crazy. Saying that she got into it with somebody in the parking lot after the club." The appellant got out of the driver's side of the SUV and approached Thomason's car. The appellant and Thomason argued then began fighting. The appellant pulled Thomason out of the car, choked her hard, stood over her, and "punched" her at least twice with a closed fist while she was lying on her back on the ground.

Mr. Farmer, whom Tucker described as "a small frame guy," grabbed the appellant's shoulder and attempted to break up the fight, but the appellant pushed Mr. Farmer away. Toles and Mitchell ran toward the appellant, ready to defend Mr. Farmer. The appellant attempted to hit Mitchell but missed, and Mitchell hit the appellant in the back of the head. Cook got out of the SUV holding a gun. Mitchell, Tucker, and Toles testified that Cook was holding the gun; Bell testified that Cook raised his shirt to display the gun that was tucked

---

[1]Two of the individuals in this case share a surname. Therefore, for clarity, we will refer to Randy Farmer as "Mr. Farmer" and Portia Farmer as "Ms. Farmer."

into his waistband. Cook stood next to the SUV and threatened, "I will shoot this motherf[****]r up"; however, Cook did not point the gun at anyone. Mitchell, Toles, Tucker, and Mr. Farmer backed away without issuing any threats, and got into the Lincoln. The appellant and Cook quickly returned to the SUV and drove out of the parking lot, making a right turn onto Mt. Moriah. Cook was in the backseat of the SUV, and the appellant was driving.

After the SUV left, Tucker drove out of the parking lot and turned right, intending to go to Mr. Farmer's house. On Mt. Moriah, the Lincoln was in the middle lane, and the SUV was proceeding at approximately "two miles per hour" in the far right lane. When Tucker began to pass the SUV, the appellant stopped the SUV, jumped out, ran toward the Lincoln, and fired at least ten shots at the passenger side of the car. The appellant's pistol appeared to be either a .40 or .45 caliber and appeared to be the same gun Cook was holding in the parking lot. The Lincoln's windows and doors were damaged during the shooting.

Mitchell said that when the appellant began shooting, Mitchell "got low on the backseat," and Tucker sped up to get away. Mitchell sat up, and the appellant's final shot struck Mitchell in his back. Tucker was shot in the leg, Toles was uninjured, and Mr. Farmer was shot in the head. Around the corner, the men saw Memphis Police Officer Charles Wimbush and told him about the shooting. Officer Wimbush noticed that the men were injured and called for backup and an ambulance. When additional officers arrived, they secured the scene.

When the ambulance arrived, Mitchell and Tucker were transported to Methodist Hospital. Mitchell underwent surgery to have the bullet removed from his back, and he remained in the hospital for one week. Tucker also underwent surgery to have the bullet removed from his leg and to have the damage caused by the bullet repaired. Mr. Farmer died from his gunshot wounds. The victims had not met the appellant or Cook before the shooting. None of the men in the Lincoln had a weapon that evening.

Dr. Karen Chancellor testified that the autopsy revealed that Mr. Farmer was five feet, eight inches tall and that he weighed 156 pounds. Dr. Chancellor said that Mr. Farmer was shot three times, and his death was caused by multiple gunshot wounds.

After the shooting, Sergeant Gerald Paige found a bullet hole in the right side of the Lincoln's windshield and two bullet holes in the right side of the car. More bullet holes were discovered in the right taillight, the trunk, and the right quarter panel. Inside the car, bullet holes were in the backseat area, the armrest, the right front seat headrest, and the right front seat. Additionally, Sergeant Paige found blood on the right front seat. A spent bullet was found beside the driver's seat. Sergeant Paige did not find a gun in the Lincoln. At the scene

-3-

of the shooting, Sergeant Paige found eleven spent bullet casings, which were collected as evidence.

On July 6, 2010, Cook gave a statement informing the police that the gun used in the shooting was at his mother's house. Officer Sam Blue searched Cook's mother's residence and found a .40 caliber gun underneath a dresser drawer. After the police retrieved the gun, Officer James Terry Max took the gun to the Tennessee Bureau of Investigation (TBI) for testing. Officer Max also submitted for testing the eleven spent .40 caliber cartridge casings retrieved from the scene of the shooting and the spent projectile recovered from the Lincoln.

On July 7, 2010, Officer David Payment processed the Lincoln and found some "ricochet glancing damage" and eight bullet holes. Inside the car, he found a cellular telephone and an MP3 player but did not find any weapons. Officer Payment also processed the SUV and found no bullet damage.

Steve Scott, a special agent forensic scientist with the firearms identification unit of the TBI crime laboratory, testified that he examined the Smith and Wesson .40 caliber semiautomatic pistol and determined that, including the magazine and the chamber, the pistol could hold a maximum of fifteen bullets. Testing revealed that the eleven spent cartridge casings found at the scene of the shooting, the spent bullet found in the Lincoln, and the bullets retrieved during the autopsy were fired from the pistol.

Defense witnesses Kendria Warren, Thomason, and Portia Farmer testified that on the evening of July 5, 2010, they were at the Level 2 Club. Around 3:00 a.m., they decided to leave. As they left, a woman and her boyfriend "got into an altercation" with Thomason, during which Thomason was hit. Afterward, Thomason and the appellant spoke by telephone, and he told her to meet him at Krystal's. During the drive to the restaurant, Burks and Thomason spoke by telephone and also agreed to meet at the restaurant.

When Thomason's group arrived at the restaurant, Burks approached Thomason's car while Bell stopped to talk to the victims, who were gathered around a Lincoln. Burks opened the back door on the driver's side and asked Warren about the incident at the club. While the women were talking, Mitchell was sitting on the Lincoln's trunk, playing with a gun.

The appellant came over to talk with Thomason. Thomason said that they began arguing about her altercation at the club because she was upset and emotions "got out of hand" during her explanation. When Thomason got out of the car, the appellant began choking her, and she fell to the ground. Thomason said that Warren and Portia came over to help and told the appellant to get off her but that no one else came to her aid. The appellant backed up, and Thomason stood. Thomason said that the appellant pushed her "off

-4-

the car," and their argument continued. Mitchell came over and hit the appellant hard "up side the head with a gun."

Thomason, Ms. Farmer, and Warren said that Cook came around the right side of Thomason's car and that he showed the gun. Thomason heard him say, "[N****]r, we don't pistol play. We don't fight. We strap." Thomason then heard Mitchell respond, "[S]ince, y'all want to pistol play, y'all got 30 seconds to get off the lot." The individuals in the lot got into their vehicles to leave. Warren said that she did not hear anyone talking about following anyone else. Warren said that as they left the parking lot, she heard gunshots. When she looked back, she saw the appellant outside of his SUV, with a gun in his hand, shooting at the Lincoln. Thomason and Ms. Farmer said that they heard gunshots but that they did not see the shooting.

The twenty-three-year-old appellant testified that in the early morning hours of July 5, 2010, he was with Cook. While they were driving around, he called Thomason. She told him that she was going to Krystal's, and he went to meet her there.

The appellant said that when he arrived, Burks came over and spoke with him. He told her that he was going to see what was wrong with Thomason. The appellant noticed that two men were around a Lincoln and that Bell and Randy were talking. After speaking with Burks, the appellant walked over to Thomason's car. He detected that she had been drinking, knew that she had been driving, and asked "why she [was] drinking with passengers in the car." Thomason opened her car door and, as she got out, stumbled and fell. Thomason and the appellant began to argue because the appellant "didn't understand why she's drinking and she wouldn't tell [him] what happened at the club." The appellant said that he was trying to discern if Thomason was okay or if she needed medical assistance. The appellant got mad at Thomason, put his hands on her, and began struggling with her.

The appellant said that after Thomason fell, he stood over her and told her that she did not need to be driving while intoxicated. She would not talk to him, and he grabbed around her collarbone to get her up. Thomason told him to get away, and he backed up. The appellant heard someone tell him not to hit Thomason. The appellant responded, "I'm not fixing to hit. I'm just trying to see what's going on." He explained, "I'm trying to get away from everybody else so she wouldn't be showing out and so we can talk one-on-one." The appellant acknowledged that he was feeling agitated.

The appellant stated that when Thomason stood up, "she still was acting crazy," and they moved toward the front of her car. The appellant pushed her onto the car to try to take her keys and prevent her from leaving. Warren then yelled at the appellant, trying to get him away from Thomason. At that point, someone hit the appellant in the back of the head. The

-5-

appellant said that the punch left him dazed and hurting. The appellant did not know who hit him or why he was hit. The appellant looked around and saw Cook pull out his gun. Randy and his friends responded by "jumping up and down, like, rowdy, [as if] they wanted to do some more things." The men said, "You pistol playing."

The appellant said he became nervous because he did not know whether Cook intended to shoot. Cook said, "[H]e don't know me like that. I'll shoot." The other men told Cook to put up his gun and said "you got 30 seconds to get off the lot." The appellant said that Mitchell had a gun in his hand and that the appellant feared the men would try to kill him. The appellant said that things were happening so quickly he did not know how to react and did not know "what was fixing to go down"; however, he knew that Cook's displaying his gun had angered Randy's group. The appellant told everyone to get in their cars because he was in the open and had no way of defending himself. He also believed that innocent bystanders could be injured if gunfire erupted.

The appellant said that he and Cook got into the appellant's SUV. The appellant backed out of his parking space, looked at Randy's group, and heard them say to follow the appellant. When the appellant drove away, Randy's group quickly followed. Randy's group managed to block the parking lot's exit, forcing the appellant to make a right turn. The appellant sped away, and the men pursued. The appellant said that he saw the Lincoln quickly approaching, as if to ram the SUV. The appellant heard a gunshot and saw Cook duck. The appellant said that he did not want the men to follow him home. He also stated that he thought that the men might be after him or Cook and that he needed to defend himself. The appellant grabbed Cook's gun from the console, got out of the car, and started shooting at the Lincoln without aiming at anyone. The appellant said, "I ain't know that nobody was going to get killed. I just wanted to protect me." The appellant stated that he feared the men because

> I heard a [shot]. I mean, where else would a shot come from but
> I saw him with a gun on the lot. And I knew of Randy Farmer
> involved in a murder. So I don't know. I ain't know what else
> to expect.

The appellant said that he had gone to high school with Randy's "baby mother" and that he knew of Randy. When the appellant saw Randy in the parking lot that night, he was "shocked and surprised because I knew he was involved in a murder." The appellant stated that he did not remember Randy getting involved in the altercation the appellant had with Thomason.

The appellant said that he got in the SUV and drove away after the shooting. He was

frightened for his life and panicked. The appellant maintained that he initially tried to avoid the situation then felt like he had to defend himself and Cook. He said that he was not trying to kill anyone and that he "was trying to just get them off of me really. Just like warning shots. I was trying to shoot the tires." The appellant said that he regretted the incident and wanted the victims and their families to forgive him.

On cross-examination, the appellant said that he did not know that Cook had a gun that night until he displayed it to Randy and his friends. The appellant said that he did not choke Thomason but that he grasped her shoulders and tried to get her keys so that she would not drive intoxicated. He said, "We were arguing about nothing really." After Thomason stood, the appellant pushed her against the car to try to get her attention. Warren and Burks tried to intervene, but none of the men did.

The appellant acknowledged that he thought Mitchell hit him with the gun but that he had not seen the strike and could not be sure who or what hit him. Mitchell told everyone to get off the parking lot in thirty seconds. The appellant conceded that although he was concerned about Thomason's driving while intoxicated, he did not offer to drive her and her friends away from the parking lot. The appellant denied stopping on Mt. Moriah, insisting that he jumped from his moving SUV. The appellant asserted that he did not aim at "anybody. I just aimed at the direction cause I wasn't looking at first." At the time, he did not realize that he fired multiple shots that hit the Lincoln and injured three of the passengers. The Lincoln drove past the appellant, but he did not see any broken glass or damage to the vehicle. He "thought they was just going to get away from me cause I saw them kept going." The appellant acknowledged that he shot at the Lincoln once after it drove past him. He explained that he aimed for the tires so the car would not be able to follow him home. The appellant stated that he knew a police station was on Mt. Moriah about fifty yards away from the scene of the shooting and that he did not think of calling 911 for assistance. After the shooting, the appellant did not go to the police station and instead drove Cook home. When Balfour called the appellant later that morning to ask what happened, the appellant told her that he shot the men because they were following him. On July 7, shortly before he turned himself in to the police, the appellant saw Thomason at Warren's house.

After the appellant testified, the defense rested. In rebuttal, Xavier Cook testified that he was with the appellant in the early morning hours of July 5, 2010. Around 1:00 or 2:00 a.m., the appellant learned of the incident Thomason had at a club and asked Cook to get his gun. They went to Cook's house, Cook got his mother's gun, and he gave the gun to the appellant. Thereafter, they went to Krystal's to wait for Thomason. When they arrived, Cook told the appellant to leave the gun in the truck. Cook sat in the truck, and the appellant got out of the vehicle. Cook did not say when he put the gun in the waistband of his pants.

Cook said that when Thomason arrived at the parking lot, the appellant asked her what had occurred. Thomason and the appellant started "arguing and tussling." The appellant asked Thomason "where the n[****]rs was at." While the appellant was "tussling" with Thomason, four men Cook did not know tried to surround the appellant. Cook pulled the gun from the waistband of his pants and said, "[N]aw, it's not going to go down like that. Y'all ain't fixing to jump on him or nothing." Cook said that he did not point the gun at anyone but kept the gun in his hand at his side. Cook told the appellant that they should leave, and they got into the appellant's SUV. Cook put the gun on the console. Cook heard one of the four men say, "[G]o bring the strap up here, such and such and such. Man, he pistol playing us and all this and that." The four men got into their car, and Cook heard them say, "We fixing to follow these n[****]rs." Although the four men backed out of their parking space first, they waited for the appellant to back up and followed as he made a right turn out of the parking lot. The appellant grabbed the gun from the console, jumped out of the SUV, and "[u]nloaded" the gun, shooting ten or eleven times at the Lincoln. After the shooting, the appellant got back into the SUV and returned the gun to Cook. The appellant took Cook home then left.

Cook said that he did not see anyone else in the parking lot with a gun. When the four men approached the appellant, they hit their fists together and acted "like they was fixing to jump on him." Cook heard no gunshots other than the ones fired by the appellant. Cook saw the appellant the day after the shooting, and the appellant asked what Cook intended to tell the police. Cook acknowledged that he had been charged for his role in the offense but maintained that he had not been promised anything for his testimony.

On cross-examination, Cook admitted that he hoped "to get a better deal for testifying." He said that all four men acted as if they wanted to fight the appellant but that none of them had a gun. Cook did not see any of the men hit the appellant in the head. Cook said that he pulled out his gun because he felt threatened when the men surrounded the appellant.

Cook stated that Mr. Farmer spoke with someone by telephone and told them to bring a gun. Cook said that the men intended to follow Cook and the appellant until the men got their guns. Cook thought that his and the appellant's lives were threatened.

The jury convicted the appellant of second degree murder, three counts of attempted second degree murder, and possession of a firearm during a dangerous felony. The trial court sentenced the appellant to twenty years for the second degree murder conviction, ten years for each attempted second degree murder conviction, and six years for the possession of a firearm during a dangerous felony conviction. The court ordered the six-year sentence to be served consecutively to the other sentences, which were to be served concurrently, for a total

-8-

effective sentence of twenty-six years. On appeal, the appellant challenges the sufficiency of the evidence sustaining his convictions and the trial court's refusal to allow the appellant to introduce evidence of the deceased victim's involvement in an unrelated murder.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1). Additionally, a criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the

-9-

offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3). Further, Tennessee Code Annotated section 39-17-1324(b)(2) provides that it is an offense to employ a firearm during the attempt to commit a dangerous felony; the specific felony alleged in the instant case was attempted second degree murder. Tenn. Code Ann. § 39-17-1324(i)(1)(B).

In the light most favorable to the State, the proof adduced at trial revealed that Mr. Farmer, Tucker, Toles, and Mitchell went to Krystal's after being at a club. While in the parking lot, the men witnessed the appellant and Thomason argue, then the appellant pulled Thomason from her car, put her on the ground, stood over her, and began choking her and hitting her. Mr. Farmer attempted to stop the altercation. An altercation ensued, during which the appellant was struck on the head. In response, Cook displayed his gun and threatened to shoot. Mr. Farmer, Tucker, Toles, and Mitchell did not want to "gun play" and left the parking lot, turning right behind the appellant. As they were driving away, they saw the appellant's SUV driving very slowly. The appellant jumped out of the SUV, ran toward the Lincoln, and fired at least eleven shots at the car. At least eight of the shots hit the car. Mitchell, Tucker, and Mr. Farmer were struck by the bullets. Mr. Farmer died from his injuries. After the incident, the appellant drove away from the area.

The appellant does not dispute that he used a gun, that he shot at the Lincoln, and that the passengers inside were injured or killed. However, he argues that the evidence showed that he acted in self-defense or, in the alternative, that, at most, he committed voluntary manslaughter, not second degree murder. Tennessee Code Annotated section 39-11-611(a) provides:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly

-10-

believed to be real at the time, and must be founded upon reasonable grounds.

See also State v. Fred Edmond Dean, No. 03C01-9508-CC-00251, 1997 WL 7550, at *6 (Tenn. Crim. App. at Knoxville, Jan. 10, 1997). Self-defense is essentially a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743. Furthermore, "[t]he state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996); see also State v. Sims, 45 S.W.3d 1, 9-10 (Tenn. 2001).

Voluntary manslaughter, which is a lesser included offense of second degree murder, is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The principal distinction between the two crimes for purposes of this appeal is the existence of adequate provocation.

The jury heard the proof and rejected the defense theories that the offenses were committed in self-defense and that, in the alternative, the offenses were, at most, voluntary manslaughter and attempted voluntary manslaughter. In determining whether an appellant acted in self-defense, a jury must determine "whether the [appellant's] belief in imminent danger was reasonable, whether the force used was reasonable, and whether the [appellant] was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. at Knoxville, June 25, 1998). Moreover, "[w]hether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for [the finder of fact]." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); see also State v. Williams, 38 S.W.3d 532, 538 (Tenn. 2001). We defer to the finder of fact's evaluation of the evidence and its determination regarding the existence of adequate provocation and self-defense. See, e.g., Johnson, 909 S.W.2d at 464.

The State's witnesses testified that the appellant assaulted Thomason, prompting Mr. Farmer, Toles, Tucker, and Mitchell, who were unarmed, to intervene. Thereafter, Cook threatened the victims with a gun. As the victims were leaving the area, the appellant jumped out of his vehicle and fired multiple rounds at the victims' vehicle, injuring two of the men and killing a third. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim.

App. 2000). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence was sufficient to support the appellant's convictions.

## B. Victim's Prior Acts

As his final issue, the appellant contends that the trial court erred by not allowing him to question Sergeant Mullins about the circumstances underlying Mr. Farmer's facilitation of first degree murder charge.

During the appellant's direct examination, he testified that he "knew of Randy Farmer involved in a murder." The State objected and asked for a jury-out hearing. During the hearing, the appellant testified that he did not know Mr. Farmer personally but that he knew of him because the mother of Mr. Farmer's child, Beyonce, had gone to Kirby High School with the appellant. The appellant said that he was at a Kirby High basketball game and that he overheard someone tell Beyonce they "hope[d Mr. Farmer] beat the murder case." Because of that conversation, the appellant thought Mr. Farmer had been charged with murder. When the appellant saw Mr. Farmer at Krystal's, he thought Mr. Farmer must have "beat his murder" or been released on bond. After one of Mr. Farmer's friends struck the appellant in the head with a gun, the appellant thought "[t]hat they'll kill. [Their] intention was to kill. If Randy Farmer was involved in a murder and he had a gun at that time and struck me already for no reason, so that's . . . what I thought."

On cross-examination, the appellant said that he had heard about the pending murder charge a couple of months before the shooting and that he thought Mr. Farmer was in jail at the time. The appellant said that while at the game, he had asked whether Mr. Farmer had killed someone and he was told, "[N]aw, he was just involved."

The trial court ruled that the appellant would be allowed to testify that he knew of Mr. Farmer's involvement in a murder. Pursuant to this ruling, when the jury was brought back into the courtroom, the appellant testified that he feared the men because he "knew of Randy Farmer involved in a murder."

After the appellant testified, defense counsel requested a Rule 404(b) hearing to determine if the trial court would allow the defense to call Sergeant Mullins, who investigated the murder in which Mr. Farmer was involved, to testify about the specific facts that resulted in Mr. Farmer's murder charge. The appellant argued that the testimony was necessary to show the appellant's state of mind. The State responded that the appellant had testified that he knew of Mr. Farmer's involvement in a murder, that specific facts regarding

-12-

that charge would be unfairly prejudicial, and that any statements Mr. Farmer made to Sergeant Mullins were uncorroborated hearsay.

During an offer of proof, Memphis Police Sergeant Anthony Mullins testified that he had investigated the homicide of a man on Mendenhall, south of Knight Arnold. In the course of his investigation, he learned that Mr. Farmer went into a Chinese restaurant and asked the victim to step outside. When the victim did not comply, a gunman entered the restaurant and shot the victim. As a result of his involvement, Mr. Farmer was charged with facilitation of first degree murder. As part of his investigation, Sergeant Mullins interviewed Mr. Farmer, who admitted "that he knew that the victim and the shooter . . . had been involved in a feud and that he went there to lure [the victim] outside for the shooter, and that he was present when the shooting occurred."

On cross-examination, Sergeant Mullins stated that Mr. Farmer died while the charges against him were still pending. He said that during his investigation, he found nothing to suggest Mr. Farmer was armed or threatened the victim of the homicide.

The trial court ruled:

> I'm going – I'm going to sustain the objection on both of the issues. The first one as far as violent acts, it may have been a conspiracy or something like that, but there's nothing to show that Mr. Farmer did anything violent. He wasn't armed, didn't threaten the person or anything along those lines. And I think you're only trying to introduce this in the [context] of 404(B) to show conduct that is offered only to show the character of the person. You know, to show the character of the person and then actions in conformity therewith which is prohibited by the rule. And what the witness testified to doesn't help you at all with that. It doesn't go at all.
>
> It's not a violent act committed by Mr. Farmer that would further corroborate or support the self-defense or the reason that the [appellant] in this case feared the victim. So the acts that were involved there are irrelevant. And I think I was correct in allowing the [appellant] to testify about, you know, what he thought the charge was, but I'm not going to allow you to go into any of those details. I just don't think you've met the burden.

On appeal, the appellant contends that Sergeant Mullins's testimony was admissible to show why the appellant feared Mr. Farmer. The State contends that there was no factual basis supporting the appellant's claim that Mr. Farmer had "first aggressor tendencies." Specifically, the State maintains that "[i]f [Mr. Farmer] had only facilitated the unrelated murder, he lacked the intent to commit the crime." Moreover, the State asserts that even if the trial court erred by excluding the testimony, the error was harmless.

Initially, we note that the appellant contends that Sergeant Mullins's testimony about Mr. Farmer's facilitation of murder charge was admissible under Tennessee Rule of Evidence 404(b). However, our supreme court has explained, "'Evidence of crimes, wrongs or acts, if relevant, [is] not excluded by Rule 404(b) if [the acts] were committed by a person other than the accused.'" State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002) (quoting State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997)). Therefore, as our supreme court stated in Stevens, Rule 404(b) is inapplicable in this situation.

This court has previously stated that "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). When the appellant's fear of the victim is relevant and the appellant is aware of the prior acts, the appellant is permitted to testify concerning his knowledge of the victim's violent conduct. State v. Hill, 885 S.W.2d 357, 361 n. 1 (Tenn. Crim. App. 1994) (citing Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978)). Only the appellant is allowed to testify regarding his knowledge because "[t]he state of mind, the fears, and apprehensions of defendant are reflected by what he has been told, not by what other persons have seen the deceased do." Williams, 565 S.W.2d at 505. In the instant case, the appellant testified that he knew Mr. Farmer had been involved in a murder. Therefore, there was proof in the record to establish the appellant's state of mind as it pertained to his fear of the victim.

This court has explained that before the defense may introduce evidence of a victim's prior acts of violence in order to corroborate the claim that the victim is the first aggressor, "the evidence must establish an issue which makes such evidence relevant, and, therefore, admissible." State v. Robinson, 971 S.W.2d 30, 40 (Tenn. Crim. App. 1997). Further, before proof of first aggression may be admitted, the following conditions must be satisfied:

1. Self-defense must be raised by the proof and not by the words and statements of counsel.

2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first

-14-

aggression.

> 3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781.

The trial court found that the issue of self-defense was raised by the proof. However, the court found that there was no factual basis to support the claim that Mr. Farmer had first aggressor tendencies and that the testimony was therefore irrelevant. The appellant alleges that "the trial court incorrectly found that the victim's facilitation of first degree murder was not a violent offense." This court has previously explained that

> [t]he mere fact that one has a conviction [or an arrest] on his record, does not necessarily prove that he was the first aggressor, or that he even committed an aggressive act. For that matter, not all evidence of violent acts establish evidence of aggression. . . . Rather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression.

State v. Latteral Jolly, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim .App. at Jackson, Dec.15, 1993); see also State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *8 (Tenn. Crim. App. at Jackson, Apr. 5, 2012), perm. to appeal denied, (Tenn. 2012). After considering the proffered testimony, the trial court found that Sergeant Mullins's testimony regarding the factual basis underlying the facilitation of murder charge did not reflect that Mr. Farmer "did anything violent." We disagree with the trial court's conclusion that Mr. Farmer's efforts to lure a victim outside so that he could be killed does not reflect that Mr. Farmer "did anything violent." Nevertheless, we conclude that the trial court did not abuse its discretion by excluding Sergeant Mullins's testimony.

Regardless, we note that proof of specific prior violent acts serves only to corroborate a claim that the victim was the first aggressor. In the instant case, every witness except the appellant,[2] testified that Mr. Farmer approached the appellant while the appellant was assaulting Thomason, and many of the witnesses testified that Mr. Farmer tried to pull the appellant away from her. This proof potentially corroborated the appellant's theory that Mr.

_____

[2]As we stated earlier, the appellant testified that Mr. Farmer, Toles, Tucker, and Mitchell all approached him at the same time and that Mitchell struck him.

-15-

Farmer was the first aggressor. Moreover, as we noted, the appellant testified that he feared Mr. Farmer because Mr. Farmer had been involved in a murder. Accordingly, even if the exclusion were error, such error was harmless. <u>See</u> Tenn. R. App. P. 36(b); <u>State v. Rodriguez</u>, 254 S.W.3d 361, 371-72 (Tenn. 2008).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE